Mod AO 442 (09/13) Arrest Warrant     AUSA Name & Telno:  Richard Cooper 212-637-1027

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

|  |  |
|---|---|
| United States of America | **1:16-MJ-133A** |
| v. | ) |
| DAVID HOBSON | )   Case No.   16 Mag. |
|  | ) |
|  | )   *S1) 16cn35'* |
|  | ) |
|  | ) |
| *Defendant* | ) |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   DAVID HOBSON

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment         ☐ Superseding Indictment        ☐ Information     ☐ Superseding Information      ☐ Complaint
☐ Probation Violation Petition      ☐ Supervised Release Violation Petition       ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

   Conspiracy to commit securities fraud (18 U.S.C. 371)
   Conspiracy to commit wire fraud (18 U.S.C. 1349)
   Securities Fraud (15 U.S.C. 78j(b) & 78ff)

S/Andrew J. Peck

Date:    06/01/2016

*Issuing officer's signature*

City and state:   New York, New York

Hon. Kevin Nathaniel Fox
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ |
| at *(city and state)* _____ |
| Date: _____ |
| *Arresting officer's signature* |
| *Printed name and title* |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA             :        SEALED INDICTMENT
                                     :
          - v. -                     :        S1 16 Cr. 351 (LTS)
                                     :
DAVID HOBSON,                        :        1:16-MJ-133A
                                     :
          Defendant.                 :
                                     :
- - - - - - - - - - - - - - - x

COUNT ONE
(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

Relevant Entities and Individuals

1.   At all times relevant to this Indictment, Brokerage Firm-1 was an investment bank and a dually registered investment adviser and broker-dealer, headquartered in Canada, with a regional office in, among other places, Providence, Rhode Island.

2.   At all times relevant to this Indictment, Brokerage Firm-2 was an investment bank and a dually registered investment adviser and broker-dealer, headquartered in New York City, with a regional office in, among other places, Providence, Rhode Island.

3.   Between approximately 2002 and 2010, DAVID HOBSON, the defendant, was an investment advisor at the Providence, Rhode Island office of Brokerage Firm-1.

1

4.    Between approximately 2010 and May 2016, DAVID HOBSON, the defendant, was an investment advisor at the Providence, Rhode Island office of Brokerage Firm-2.

5.    At all times relevant to this Indictment, a pharmaceutical company (the "Pharma Company") was headquartered in New York, New York.

6.    At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CW-1") was employed by the Pharma Company as a Master Planner in the Active Pharmaceutical Ingredient Supply Chain Group, a position in which he was tasked with evaluating manufacturing demands and capacity within the Pharma Company.

7.    DAVID HOBSON, the defendant, and CW-1 were childhood friends and remained friends at all times relevant to this Indictment.  From approximately the mid-1990s through approximately 2016, CW-1 maintained brokerage accounts with HOBSON at each of the brokerage firms at which HOBSON was employed.  Between at least in or about 2008 and in or about 2014, HOBSON and CW-1 stayed in frequent contact, often speaking and emailing multiple times a day about potential investments, politics, and personal matters, among other topics.  At all times relevant to this Indictment, HOBSON was aware that CW-1 was employed at the Pharma Company.

8.   At all times relevant to this Indictment, Medivation, Inc. ("Medivation") was a biopharmaceutical company headquartered in California.   Medivation's securities traded under the symbol "MDVN" on the National Association of Securities Dealers Automated Quotations ("NASDAQ").

9.   At all times relevant to this Indictment, Ardea Biosciences, Inc. ("Ardea") was a biotechnology and drug development company headquartered in California.   Ardea's securities traded under the symbol "RDEA" on the New York Stock Exchange ("NYSE").

10.   At all times relevant to this Indictment, Furiex Pharmaceuticals, Inc. ("Furiex") was a drug development company headquartered in New York, New York.   Furiex's securities traded under the symbol "FURX" on the NYSE.

### The Relevant Insider Trading Policies

11.   At all times relevant to this Indictment, Brokerage Firm-1's written policies prohibited employees from using "material non-public information" "to trade for personal benefit or for the benefit of others."   The policies defined as "material" any "information that could influence an investor's decision to buy or sell a security, or information that if generally known, would likely affect the market price of the security."   Examples of such information provided in the policies included "new products or services" and "potential

3

mergers or acquisitions."  The policies specifically warned that if a "Financial Consultant executes a transaction for a client with the knowledge that the client has 'inside information,' the Financial Consultant may be liable for aiding and abetting a violation of the federal securities laws."  In both 2007 and 2008, DAVID HOBSON, the defendant, affirmed that he had reviewed, understood and agreed to comply with Brokerage Firm-1's written policies.

12.  At all times relevant to this Indictment, Brokerage Firm-2's written policies prohibited brokers from trading "personally or on behalf of another, on material non-public information," which was defined as including non-public information about "significant merger or acquisition proposals or agreements" and news about "entering into or termination of significant contractual arrangements."  In connection with the commencement of his employment at Brokerage Firm-2, DAVID HOBSON, the defendant, attested that he had read and understood all of Brokerage Firm-2's insider trading policies and agreed to abide by them.

13.  At all times relevant to this Indictment, the Pharma Company's written policies prohibited the use of material, non-public information received during the course of employment to trade in any security or to provide such information to anyone else so that that person could trade in any security based on

4

such non-public information.  The Pharma Company's policy and business conduct statement specifically noted that "material" information was information that "an investor might consider important in deciding whether to buy, sell or hold securities" and provided, as an example, information concerning "possible . . . acquisitions."  It defined "non-public" as any information that "has not been adequately disclosed to the public."

14.  In each year between at least 2008 and 2014, CW-1 signed an "Integrity Pledge" in which he affirmed that he had read, understood and agreed to abide by the Pharma Company's policies, including its insider trading policies.

## The Insider Trading Scheme

15.  From in or about May 2008 through in or about April 2014, CW-1 acquired material, non-public information ("Inside Information") as part of his employment at the Pharma Company concerning potential acquisitions and transactions being considered by the Pharma Company.  Typically, CW-1 was not provided with the identity of the potential acquisition target or specific drug at issue.  Rather, CW-1 was provided certain information relevant to his evaluation of manufacturing capacity planning, including, among other things, the drug indication and stage of development.  CW-1, aided in some instances by DAVID HOBSON, the defendant, then used this information to perform

research to discern the identity of the potential acquisition
target.

16.   After the potential acquisition target had been
identified, CW-1 passed the Inside Information to DAVID HOBSON,
the defendant, who then executed trades on the basis of the
Inside Information in brokerage accounts belonging to himself,
to CW-1, and to other clients of Brokerage Firms-1 and 2 for
whom he was the registered representative ("Brokerage Firm-1
Customer Accounts" and "Brokerage Firm-2 Customer Accounts",
respectively) including trades in Medivation, Ardea and Furiex,
among others.   Trades executed by HOBSON traveled by wire
communication over computer servers located in New York, New
York.

## Insider Trading in Medivation

17.   In or about January 2008, the Pharma Company began to
consider a potential transaction with Medivation, which had
recently announced plans to begin the final phase of clinical
trials for Dimebon, a drug for the treatment of Alzheimer's
disease.

18.   On or about March 6, 2008, in connection with a
possible deal, the Pharma Company entered into a confidentiality
agreement with Medivation.   In order to safeguard Medivation's
identity, the Pharma Company assigned a project, or code name,
to the potential deal.   As was often the practice at the Pharma

Company, the code name selected, "Madeline," began with the same first letter as the actual acquisition target.

19.   In or about May 2008, CW-1 learned that the Pharma Company was considering a deal with a company with code name "Madeline."

20.   With additional information that CW-1 learned during the course of his employment about the potential acquisition target, including information received on May 27, 2008, CW-1 successfully determined that "Madeline" was a code name for Medivation.   CW-1 then tipped DAVID HOBSON, the defendant, that the Pharma Company was considering an acquisition of Medivation.

21.   On or about May 28, 2008, DAVID HOBSON, the defendant, began purchasing Medivation shares for both himself and for CW-1 and began purchasing Medivation call options for himself, all in accounts at Brokerage-Firm 1.   Between approximately May 29, 2008 and approximately August 2008, DAVID HOBSON, the defendant, continued to purchase and sell Medivation shares and call option contracts for himself, CW-1, and for certain Brokerage Firm-1 Customer Accounts.

22.   As of September 2, 2008, DAVID HOBSON, the defendant, owned 15,800 Medivation shares and thirty Medivation call option contracts and there were approximately 9,750 Medivation shares in certain Brokerage Firm-1 Customer Accounts.

23.  On September 3, 2008, prior to the opening of the market, the Pharma Company and Medivation announced a licensing agreement pursuant to which the Pharma Company would pay Medivation up to $750 million to develop and commercialize Dimebon.  When the market opened that morning, Medivation stock began trading at $33.80 per share, an increase of 29.9 percent from the closing price the prior day.

24.  That morning, DAVID HOBSON, the defendant, sold the entirety of his Medivation holdings for total profits of approximately $122,434.  Starting that day and continuing over the next several days, HOBSON also sold all of his clients' Medivation stock holdings for total profits of approximately $100,169.

### Insider Trading in Ardea

25.  On or about January 7, 2010, Ardea issued a press release disclosing positive results in a clinical trial of RDEA594, its leading drug candidate for the treatment of gout.

26.  In or about April 2010, in light of RDEA594's promising clinical trials, the Pharma Company began to consider a potential acquisition of Ardea.  On or about April 12, 2010, the Pharma Company entered into a confidentiality agreement with Ardea relating to a potential acquisition.  The Pharma Company assigned the potential acquisition the project name "Athens."

27. In or about early June 2010, CW-1 was informed of the existence of Project Athens because CW-1's assistance was needed in evaluating the Pharma Company's capacity to manufacture RDEA594. Based on information CW-1 obtained in the course of his employment, CW-1 was able to determine that "Athens" was Ardea. Shortly thereafter, CW-1 tipped DAVID HOBSON, the defendant, that the Pharma Company was considering a potential acquisition of Ardea.

28. On or about March 21, 2011, CW-1 received an email informing him that the Pharma Company had decided not to pursue Project Athens. CW-1 also provided DAVID HOBSON, the defendant, with this information.

29. In or about November 2011, the Pharma Company reengaged in communications with Ardea concerning a possible acquisition. On or about November 29, 2011, the Pharma Company entered into a confidentiality agreement with Ardea. The potential acquisition continued to use the code name "Athens."

30. On or about March 6, 2012, the Pharma Company began a second round of expedited due diligence on Ardea, which was anticipated to be completed within two weeks.

31. On or about March 7, 2012, CW-1 was informed that the Pharma Company was again considering a potential acquisition of "Athens" and that the Food and Drug Administration had approved

9

a clinical trial of RDEA594.  As alleged above, CW-1 had already determined that "Athens" was Ardea.

32.  On or about the morning of March 8, 2012, CW-1 tipped DAVID HOBSON, the defendant, about the Pharma Company's renewed interest in Ardea.

33.  Between approximately July 2010, at or around the time of the first tip, and approximately April 2012, at or around the time of the second tip, DAVID HOBSON, the defendant, traded in Ardea shares and options on the basis of Inside Information provided to him by CW-1, all in Brokerage Firm-2 accounts.

34.  As of April 8, 2012, DAVID HOBSON, the defendant, owned 3,000 Ardea shares and 15 call option contracts, CW-1 owned 5,400 shares, and 3,215 Ardea shares were held in certain Brokerage Firm-2 Customer Accounts.

35.  On or before April 9, 2012, CW-1 learned that the Pharma Company had abandoned its pursuit of an Ardea acquisition.  On or about April 9, 2012, CW-1 tipped DAVID HOBSON, the defendant, about the same.

36.  On or about April 10, 2012, DAVID HOBSON, the defendant, sold all of his Ardea shares.  The next day, HOBSON sold approximately 1,700 shares from certain Brokerage Firm-2 Customer Accounts.

37.  On or about April 23, 2012, prior to the opening of the market, Ardea announced that it has been acquired by

AstraZeneca PLC for $1.26 billion.  Ardea shares opened at
$31.52 per share that day, representing a 51.25 percent increase
from the closing price the prior trading day.

38.  Following the announcement, DAVID HOBSON, the
defendant, liquidated his positions in Ardea call option
contracts, realizing profits of approximately $34,113.  HOBSON
also sold: (i) the entirety of CW-1's Ardea shares, realizing
profits of $32,522.97; and (ii) the entirety of the remaining
Ardea shares in the Brokerage Firm-2 Customer Accounts,
realizing profits of approximately $5,445.40.

### Insider Trading in Furiex

39.  On or about February 4, 2014, Furiex issued a press
release disclosing the positive results of clinical trials for a
drug to treat irritable bowel syndrome.  Following the press
release, the Pharma Company was contacted by an intermediary to
gauge its interest in a potential acquisition of Furiex.

40.  On or about March 18, 2014, the Pharma Company entered
into a confidentiality agreement with Furiex.  On or about March
21, 2014, the Pharma Company began its due diligence process to
evaluate the potential acquisition opportunity.

41.  On or about the morning of March 25, 2014, CW-1
learned that the Pharma Company was considering "Project
Fusilli," and was provided with information concerning the
potential acquisition and the nature of the drug, which was

11

necessary for CW-1's analysis of the manufacturing

considerations relevant to the Pharma Company's evaluation of

the strategic opportunity.

42.   Based on the information provided to him, CW-1 was

able to determine that "Fusilli" was a code name for Furiex.

That same day, CW-1 tipped DAVID HOBSON, the defendant, that the

Pharma Company planned to pursue an acquisition of Furiex.

43.   Immediately following the receipt of the tip, DAVID

HOBSON, the defendant, purchased a total of 750 shares of Furiex

for himself in accounts at Brokerage Firm-2.

44.   On or about the morning of March 27, 2014, DAVID

HOBSON, the defendant, purchased 250 shares of Furiex for

himself and 400 shares for CW-1 in accounts at Brokerage Firm-2.

45.   Between on or about March 25, 2014 up to and including

on or about April 25, 2014, DAVID HOBSON, the defendant,

continued to purchase shares of Furiex.  By market close on

Friday, April 25, 2014, HOBSON had purchased a total of: (i)

3,200 shares and 13 call option contracts for himself; (ii)

3,800 shares for CW-1; and (iii) approximately 2,315 shares and

five call option contracts in certain Brokerage Firm-2 Customer

Accounts.

46.   In or about the early morning of Saturday, April 26,

2014, CW-1 received an email from an employee at the Pharma

Company informing him that the Pharma Company had decided to

abandon the Fusilli transaction.   CW-1 tipped DAVID HOBSON, the
defendant, with that information the same day.

47.   On or about the morning of Monday, April 28, 2014,
before the opening of the market, Furiex issued a press release
announcing that it had entered into a definitive merger
agreement to be acquired by Forest Laboratories, Inc.   After the
opening of the market, Furiex shares began trading at $103.10
per share – a 28.5 percent increase over the closing price the
prior trading day.

48.   Also on or about April 28, 2014, following the public
announcement, DAVID HOBSON, the defendant, sold: (i) the
entirety of his Furiex holdings, realizing profits of
approximately $30,865.79; (ii) the entirety of CW-1's Furiex
holdings, realizing profits of approximately $40,883.71; and
(iii) 2,315 shares of Furiex that had been purchased in certain
Brokerage Firm-2 Customer Accounts, for which HOBSON's clients
realized profits of approximately $40,323.19.

### Statutory Allegations

49.   From in or about May 2008 through in or about April
2014, in the Southern District of New York and elsewhere, DAVID
HOBSON, the defendant, and others known and unknown, willfully
and knowingly combined, conspired, confederated, and agreed
together and with each other to commit an offense against the
United States, to wit, securities fraud, in violation of Title

15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Object of the Conspiracy

50.   It was a part and object of the conspiracy that DAVID HOBSON, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons.

### Overt Acts

51.   In furtherance of the conspiracy, and to effect the illegal object thereof, DAVID HOBSON, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

        a.   In or about May 2008, CW-1 called HOBSON to

discuss the Pharma Company's interest in acquiring Medivation.

b.   On or about May 28, 2008, HOBSON purchased 5,000 shares of Medivation for himself and 10,000 shares for CW-1.

c.   In or about the summer of 2010, CW-1 called HOBSON to discuss the Pharma Company's interest in acquiring Ardea.

d.   On or about July 2, 2010, HOBSON purchased 1,900 shares of Ardea for himself and 2,000 shares for CW-1.

e.   In or about late March 2014, CW-1 called HOBSON regarding the Pharma Company's interest in acquiring Furiex.

f.   On or about March 27, 2014, HOBSON purchased 250 shares of Furiex for himself and 400 shares for CW-1.

(Title 18, United States Code, Section 371; Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.)

## COUNT TWO
(Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

52.   The allegations contained in Paragraphs 1 through 48 and 51 of this Indictment are repeated and realleged as though fully set forth herein.

53.   From in or about May 2008 through in or about April 2014, in the Southern District of New York and elsewhere, DAVID HOBSON, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed

15

together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

54.   It was a part and an object of the conspiracy that DAVID HOBSON, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, HOBSON conspired to defraud the Pharma Company of valuable confidential business information and agreed that CW-1 would deceptively convert that information to CW-1's own use in breach of fiduciary and other duties owed to the Pharma Company, using wire communications and national securities exchanges, and would then provide that information to HOBSON who used the information to purchase and sell the securities of Medivation, Ardea, and Furiex, among other companies.

(Title 18, United States Code, Section 1349.)

### COUNTS THREE and FOUR
### (Securities Fraud)

The Grand Jury further charges:

16

55.   The allegations contained in Paragraphs 1 through 48 and 51 of this Indictment are repeated and realleged as though fully set forth herein.

56.   On or about the dates set forth below, in the Southern District of New York and elsewhere, DAVID HOBSON, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, on the basis of material, non-public information obtained from CW-1, HOBSON caused the following securities transactions to be executed:

| Count | Order Dates | Transactions |
|---|---|---|
| 3 | July 2, 2010-April 23, 2012 | Purchases of approximately 82,699 shares of Ardea; 115 Ardea call option contracts; and 68 Ardea put option contracts |
| 4 | March 25, 2014 - April 28, 2014 | Purchases of approximately 6,215 shares of Furiex; and 13 Furiex call option contracts |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

57.   As a result of committing one or more of the offenses alleged in Counts One through Four of this Indictment, DAVID HOBSON, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses.

### Substitute Assets Provision

58.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which

        cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of the defendant up to the value of the

forfeitable property described above.

    (Title 18, United States Code, Section 981; Title 28, United
            States Code, Section 2461.)


FOREPERSON

PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

DAVID HOBSON,
**Defendant.**

---

### INDICTMENT

S1 16 Cr. 351 (LTS)

(Title 18, United States Code, Section
371; Title 15, United States Code,
Sections 78j(b) and 78ff; Title 17, Code
of Federal Regulations, Sections
240.10b-5 and 240.10b5-2; Title 18,
United States Code, Section 1349; Title
18, United States Code, Section 981;
Title 28, United States Code, Section
2461. )

| | |
|---|---|
| Foreperson | PREET BHARARA |
| | U.S. Attorney. |

---

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

DAVID HOBSON,
Defendant.

## INDICTMENT

S1 16 Cr. 351 (LTS)

(Title 18, United States Code, Section
371; Title 15, United States Code,
Sections 78j(b) and 78ff; Title 17, Code
of Federal Regulations, Sections
240.10b-5 and 240.10b5-2; Title 18,
United States Code, Section 1349; Title
18, United States Code, Section 981;
Title 28, United States Code, Section
2461. )

PREET BHARARA
Foreperson                    U.S. Attorney.

20